Jason L. Melancon, Esq. (SBN 28152)
Robert C. Rimes, Esq. (SBN 28740)
R. Lee Daquanno, Jr., Esq. (SBN 36430)
MELANCON | RIMES, LLC
6700 Jefferson Hwy., Building 6
Baton Rouge, LA 70806
Telephone: (225) 303-0455
Facsimile: (225) 303-0459
Email: jason@melanconrimes.com

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZAID ABDUL-AZIZ, Individually And on behalf of all others similarly situated<br><br>*Plaintiff,*<br><br>v.<br><br>NATIONAL BASKETBALL ASSOCIATION PLAYERS' PENSION PLAN<br><br>*Defendant.* | No. CV 17-8901<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL ERISA LAWS**<br><br>JURY TRIAL DEMANDED |

## NATURE OF THE ACTION

1. This class action complaint is filed individually and on behalf of a class consisting of all former participants in the National Basketball Association Players' Pension Plan (the "Plan"), who elected to receive a form of retirement pension that terminated prior to the player or his spouse's death, if applicable, seeking a declaration that the Plan, a defined benefit pension plan, violates the Sections 204(c)(3) and 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), and further seeking injunctive relief requiring the Plan to recalculate and remit pension benefits in accordance with ERISA and IRS Code regulations.

1

**JURISDICTION AND VENUE**

2.       The claims asserted herein arise under and pursuant to ERISA §§ 204(c)(3), (g) and 502(a)(1)(B) (29 U.S.C. § 1054(c)(3), (g), and 29 U.S.C. § 1132(a)(1)(B), respectively).

3.       This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e) (29 U.S.C.S. §1132(e)).

4.       Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as the Plan maintains its headquarters and conducts business in this district at 645 Fifth Avenue, New York, New York 10022.

**PARTIES**

5.       Plaintiff Zaid Abdul-Aziz ("Abdul-Aziz") is a major domiciliary of the State of Washington.   Mr. Abdul-Aziz played ten (10) seasons in the National Basketball Association ("NBA") from 1968 - 1978.   He received eight (8) years of credited service towards his retirement and participated in the Plan from July 1991 through August 2001.

6.       Defendant National Basketball Association Players' Pension Plan, or the "Plan," provides defined retirement benefits to retired NBA basketball players.  The Plan is administered by the Pension Committee, which consists of at least two persons appointed from time to time by the majority vote of all the individual team members of the NBA, and oversees the Plan's general administration.

**CHOICE OF LAW**

7.       The Plan shall be construed, whenever possible, in conformity with the requirements of the Internal Revenue Code and ERISA, and, to the extent not otherwise in conflict with federal law, the laws of the State of New York.

## SUBSTANTIVE ALLEGATIONS

### The Plan Provides Retired NBA Players with a Choice of Electing a Normal Retirement Pension or an Actuarial Equivalent

8.     On November 7, 1969, the National Basketball Association ("NBA") reached an Agreement with representatives of the Player's Association of the National Basketball Association (aka National Basketball Players' Association or the "NBPA") (the "1969 Agreement"). *See* C-9.

9.     The 1969 Agreement amended the original NBA pension plan by providing pension benefits for all eligible players ("Every Player on the Roster of any Member during the Regular Season which included February 2, 1966 shall be eligible to participate as of February 2, 1970."). *See* C-9-000003.

10.     The 1969 Agreement resulted in amendments to the Plan in 1970 ("1970 Plan").

11.     The 1970 Plan guaranteed retired NBA players a *Normal Retirement Pension* in the form of a defined monthly benefit commencing on the first day of the first month following the player's Normal Retirement Date and continuing to be paid on the first day of each month up to and including the month in which the player dies (aka "Life Annuity"). *See* C-1-000009.

12.     In addition, the 1970 Plan offered, and all subsequently amended Plans continue to offer, an *Actuarial Equivalent* to the Normal Retirement Pension.

13.     *Actuarial Equivalents* include several options that terminate prior to the player's death: (1) a single lump sum payment (a "Lump Sum"), (2) installments of fixed amount ("Fixed Amounts"), and (3) installments for fixed period ("Fixed Period").

14.     The 1970 Plan, and all subsequently amended Plans, defined an Actuarial Equivalent as a ***benefit of equivalent value*** to a Life Annuity when computed on the basis of actuarial assumptions, such as percent interest and mortality tables as determined by the Plan.

15.     All Plans have provided retired NBA Players with the choice of electing to receive a *Normal Retirement Pension* (payable as a Life Annuity) or an *Actuarial Equivalent* (purportedly payable as a benefit of equivalent value to the Life Annuity).

16.     The Plan violates ERISA §§ 204(c)(3) and 502(a)(1)(B) because the *Actuarial Equivalents* offered to retired NBA pensioners do not provide retired players with a benefit of equivalent value when financially compared to a *Normal Retirement Pension*.

17.     The financial inequity between a *Normal Retirement Pension* and certain *Actuarial Equivalents* results from the Plan failing to pay cost-of-living adjustments ("COLAs") for Actuarial Equivalents (i.e., Lump Sum, Fixed Amount, and Fixed Period) that terminated prior to the player or spouse's death.

18.     The financial difference between the *Normal Retirement Pension* and the *Actuarial Equivalent* elected by Mr. Zaid Abdul-Aziz and his spouse in August 1991 ultimately cost their family hundreds of thousands of dollars in loss of important retirement benefits.

## The Plan Pays Significant Ongoing Cost-of-Living Adjustments to Pensioners Who Elected to Receive a *Normal Retirement Pension*

19.     The 1970 Plan guaranteed players a Normal Retirement Pension in the amount of $60.00 per month for each credited year of current service, plus a payment of $60.00 per month for each credited year of past service. *See* C-1-000009.

20.     The 1970 Plan further guaranteed that every player shall be entitled to elect, in lieu of the Normal Retirement Pension or Early Retirement Pension and Supplemental Pension, the Actuarial Equivalent beginning on the date that the pension would have otherwise become payable in one of the following ways:

a.      Lump Sum;

b.      Fixed Amounts; and

c.      Fixed Period.

4

*See* C-1-000011-12.

21.     The <u>1970 Plan</u> provided: "Actuarial Equivalent shall mean a benefit of equivalent value when computed on the basis of actuarial assumptions adopted by the Committee." *See* C-1-000003.

22.     Stated differently, the Plan contractually obligated itself to pay an Actuarial Equivalent that amounted to the same total amount of money as otherwise payable as a Normal Retirement Pension, when taking into consideration objective actuarial assumptions, such as percent interest and anticipated life span.

23.     In 1976, the Plan revised the amount payable as a Normal Retirement Pension ("1976 Plan") and instituted the first guarantee of a cost-of-living adjustment (or "COLA").

24.     The <u>1976 Plan</u> guaranteed players who became eligible to receive a Normal Retirement Pension on or before May 31, 1976, $60.00 per month for each year of credited service, or $75.00 per month for each year of credited service on or after June 1, 1976 with a cost-of-living increase, the amount of which was dependent upon the National Consumer Price Index as determined by the player's date of retirement eligibility.  *See* C-2-000008-09.

25.     The <u>1976 Plan</u> guaranteed an Actuarial Equivalent payable as a Lump Sum, Fixed Amounts, or Fixed Period. *See* C-2-000012-13.

26.      The <u>1976 Plan</u> provided: "Actuarial Equivalent shall mean a benefit of equivalent value when computed on the basis of the actuarial assumptions recommended by the Enrolled Actuary and adopted by the Committee." *See* C-2-000002.

27.     The Plan as revised in 1978 did not alter the Normal Retirement Pension amount ("1978 Plan").  *See* C-3-000009-10.

28.     The <u>1978 Plan</u> guaranteed an Actuarial Equivalent payable as a Lump Sum, Fixed Amounts, or Fixed Period. *See* C-3-000013-14.

29.     The <u>1978 Plan</u> provided: "Actuarial Equivalent shall mean a benefit of equivalent value when computed on the basis of the actuarial assumptions recommended by the Enrolled Actuary and adopted by the Committee."  *See* C-3-000003.

30.     The Plan as revised in 1981 did not alter the Normal Retirement Pension amount ("1981 Plan").  *See* C-4-000010-11.

31.     The <u>1981 Plan</u> guaranteed an Actuarial Equivalent payable as a Lump Sum, Fixed Amounts, or Fixed Period.  *See* C-4-000014-15.

32.     The <u>1981 Plan</u> provided: "Actuarial Equivalent shall mean a benefit of equivalent value when computed on the basis of the actuarial assumptions recommended by the Enrolled Actuary and adopted by the Committee."  *See* C-4-000003.

33.     The Plan as revised in 1984 did not alter the Normal Retirement Pension amount ("1984 Plan").  *See* C-5-000011-12.

34.     The <u>1984 Plan</u> guaranteed an Actuarial Equivalent payable as a Lump Sum, Fixed Amount, or Fixed Period.  *See* C-5-000019-20.

35.     The <u>1984 Plan</u> provided: "Actuarial Equivalent shall mean, unless specified otherwise, a benefit of equivalent value when computed on the basis of 7 percent interest and the 1971 Group Annuity Mortality Table (male rates)."  *See* C-5-000003.

36.     On April 27, 1988, the NBA and NBPA entered into a collective bargaining agreement ("1988 CBA"), which amended the Plan and effectuated changes to the Normal Retirement Pension amount for all former and current players.

37.     The <u>1989 Plan</u> provided that the Normal Retirement Pension would now pay $200.00 per month for each year of credited service for ***any player*** (1) who was receiving monthly benefits under the Plan as of September 1, 1988 or (2) who had not yet begun to receive a benefit under the Plan as of September 1, 1988.  *See* C-6-000014-17.

6

38.     The <u>1989 Plan</u> provided that the new monthly benefit of $200.00 per month per year of credited service applied to payments made on or after September 1, 1988.  *See* C-6-000014-17.

39.     The <u>1989 Plan</u> continued to guarantee an Actuarial Equivalent payable as a Lump Sum, Fixed Amounts, or Fixed Period.  *See* C-6-000024-25.

40.     The <u>1989 Plan</u> provided: "Actuarial Equivalent shall mean, unless specified otherwise, a benefit of equivalent value when computed on the basis of 7 percent interest and the 1971 Group Annuity Mortality Male Table set back 7 years for spouses and alternate payees."  *See* C-6-000005.

41.     The <u>1989 Plan</u> offered no guidance in either Section 3.11 outlining optional Actuarial Equivalents or Article 1, Section 1.2 defining Actuarial Equivalent as to how future cost-of-living increases to the Normal Retirement Pension might otherwise affect the mathematical calculation of the benefit of equivalent value for Lump Sum, Fixed Amounts, or Fixed Period.

42.     On September 18, 1995, the NBPA and the NBA entered into a collective bargaining agreement (the "1995 CBA"), which again amended the Plan and effectuated changes to the Normal Retirement Pension amount for all former and current players.

43.     First, the <u>1995 CBA</u> materially altered the definition of Normal Retirement Pension from a set monetary amount to a more broadly defined "Maximum Monthly Benefit."

44.     The "Maximum Monthly Benefit" was defined as the maximum monthly amount payable as a defined benefit and permitted by the applicable benefit limitations under the Internal Revenue Code of 1986, as amended (the "IRS Code") to be paid to the player at his Normal Retirement Date under the Plan.  *See* C-14-000002.

7

45.     The <u>1995 CBA</u> further provided that the new Maximum Monthly Benefit was to be continually adjusted for increases in the cost-of-living in the same manner as the cost-of-living adjustment for the dollar limitation under Section 415(b)(1)(A) of the IRS Code.   *See* C-14-000003, C-27-000001.

46.     The <u>1995 CBA</u> provided that the new Maximum Monthly Benefit would effectuate a change to the Normal Retirement Pension for all players who had not yet begun to receive a benefit under the Plan as of July 1, 1996 and to those players who were already receiving monthly benefits under the Plan as of September 1, 1996.  *See* C-14-000003.

47.     The <u>1995 CBA</u> provided that the Maximum Monthly Benefit would apply to players receiving monthly benefits as of September 1, 1996 and for all benefits paid on or after September 1, 1996.  *See* C-14-000003.

48.     Where the <u>1995 CBA</u> adopted ongoing COLAs to the Maximum Monthly Benefit, the collective bargaining agreement offered no guidance as to how these future COLAs might otherwise affect the mathematical calculation of an Actuarial Equivalent, such as Lump Sum, Fixed Amounts, or Fixed Period.

49.     On February 2, 1996, the NBA Pension Plan (the "1996 Plan") was amended to reflect the Maximum Monthly Benefit changed made pursuant to the 1995 CBA.

50.     The <u>1996 Plan</u> defined the starting Maximum Monthly Benefit at $285.00 per month for each year of credited service for all players who had not yet begun to receive a benefit under the Plan as of July 1, 1996 and for a player who was receiving monthly benefits under the Plan as of September 1, 1996.  *See* C-7-000016-21.

51.     The <u>1996 Plan</u> provided that the $285.00 monthly benefit only applied to payments made on or after September 1, 1996.  *See* C-7-000016-21.

52.     The 1996 Plan continued to guarantee an Actuarial Equivalent payable as a Lump Sum, Fixed Amounts, or Fixed Period.  *See* C-7-000029-31.

53.     The 1996 Plan provides: "Actuarial Equivalent shall mean, unless specified otherwise, a benefit of equivalent value when computed on the basis of 7 percent interest and the 1971 Group Annuity Mortality Male Table for Players, and the 1971 Group Annuity Mortality Male Table set back 7 years for spouses and alternate payees." *See* C-7-000005.

54.     The 1996 Plan offered no guidance in either Section 3.11 outlining optional Actuarial Equivalents or Article 1, Section 1.2 defining Actuarial Equivalent as to how future cost-of-living increases to the Normal Retirement Pension might otherwise affect the mathematical calculation of the benefit of equivalent value for Lump Sum, Fixed Amounts, or Fixed Period.

55.     The Small Business Job Protection Act of 1996 and subsequent legislation and regulation made numerous changes to the rules governing qualified retirement plans; therefore, the Plan was amended and entirely restated effective February 2, 1997 (the "1997 Plan").

56.     The 1997 Plan instituted a series of systematic cost-of-living increases to the Maximum Monthly Benefit governing the amount payable as a Normal Retirement Pension.

57.     The 1997 Plan amended the Normal Retirement Pension to $296.24 per month for each year of credit service for all players who had not yet begun to receive a benefit under the Plan as of March 1, 1997 and for all players who were receiving monthly benefits under the Plan as of March 1, 1997.  *See* C-8-000014-20.

58.     The 1997 Plan amended the Normal Retirement Pension to $309.34 per month for each year of credited service for all players who had not yet begun to receive a benefit under the Plan as of March 1, 1998 and for all players who were receiving monthly benefits under the Plan as of March 1, 1998.  *See* C-8-000014-20.

9

59.     The <u>1997 Plan</u> amended the Normal Retirement Pension to $321.24 per month for each year of credited service for all players who had not yet begun to receive a benefit under the Plan as of March 1, 2000 and for all players who were receiving monthly benefits under the Plan as of March 1, 2000.  *See* C-8-000014-20.

60.     The <u>1997 Plan</u> amended the Normal Retirement Pension to $333.14 per month for each year of credited service for all players who had not yet begun to receive a benefit under the Plan as of March 1, 2001 and for all players who were receiving monthly benefits under the Plan as of March 1, 2001.  *See* C-8-000014-20.

61.     The <u>1997 Plan</u> provided that the monthly cost-of-living adjustments in 1997, 1998, 2000, and 2001, respectively, only applied to payments made on or after each respective implementation date.  *See* C-8-000014-20.

62.     The <u>1997 Plan</u> continued to guarantee an Actuarial Equivalent payable as a Lump Sum, Fixed Amount, or Fixed Period.  *See* C-8-000027-28.

63.     The <u>1997 Plan</u> provided: "Actuarial Equivalent shall mean, unless specified otherwise, a benefit of equivalent value when computed on the basis of 7 percent interest and the 1971 Group Annuity Mortality Male Table for Players, and the 1971 Group Annuity Mortality Male Table set back 7 years for spouses and alternate payees."  *See* C-8-000004.

64.     The <u>1997 Plan</u> offered no guidance in either Section 3.11 outlining optional Actuarial Equivalents or Article 1, Section 1.2 defining Actuarial Equivalent as to how future cost-of-living increases to the Normal Retirement Pension might otherwise affect the mathematical calculation of the benefit of equivalent value for Lump Sum, Fixed Amounts, or Fixed Period.

65.     On January 20, 1999, the NBPA and NBA entered into a collective bargaining agreement ("1999 CBA").

10

66.     The <u>1999 CBA</u> retained the definition of the Normal Retirement Pension as the Maximum Monthly Benefit payable under the Code.  *See* C-15-000002.

67.     The <u>1999 CBA</u> stated that the Maximum Monthly Benefit shall continue to be adjusted for increases in the cost-of-living ("COLA") in the same manner as the cost-of-living adjustment for the dollar limitation under Section 415(b)(1)(A) of the IRS Code.  *See* C-15-000002, C-27-000001.

68.     The <u>1999 CBA</u> provided that any increase in the Maximum Monthly Benefit hereunder shall be effective as of the first day of the month following the beginning of the Plan Year of the Plan to which the increase relates (the "Benefits Increase Commencement Date"). *See* C-15-000002-03.

69.     The <u>1999 CBA</u> offered no guidance as to how future cost-of-living increases to the Normal Retirement Pension might otherwise affect the mathematical calculation of the benefit of equivalent value for Lump Sum, Fixed Amounts, or Fixed Period.

70.     On July 30, 2005, the NBPA and NBA entered into a collective bargaining agreement (the "2005 CBA").

71.     Upon information and belief, the <u>2005 CBA</u> implemented an additional COLA increase to the Maximum Monthly Benefit payable to for holders of a Normal Retirement Pension.  *See* C-16-000002-03.

72.     On December 8, 2011, the NBPA and NBA entered into a collective bargaining agreement (the "2011 CBA"), and amended the Plan to incorporate language providing for "New Monthly Benefit" as opposed to "Maximum Monthly Benefit."

73.     The <u>2011 CBA</u> defined the "Current Benefit" as follows: "As of the date of this Agreement, the Normal Retirement Pension payable under Section 3.2 of the Pension Plan shall

11

be $518.92 per month for each year of Credited Service payable in accordance with the provisions of the Pension Plan." *See* C-17-000002.

74.     The 2011 CBA provided for "Benefit Increases", "Effective for the Plan Year commencing February 2, 2012 and for each subsequent Plan Year beginning during the term of this agreement, the Normal Retirement Pension payable under Section 3.2 of the Pension Plan shall be adjusted (the monthly benefit amount following any such adjustment, the 'New Monthly Benefit'), subject to Section 1(c) below, such that the New Monthly Benefit is equal to the amount that results" from actuarially-determined annual contributions to the Pension Plan to fund a "Baseline Benefit." *See* C-17-000002.

75.     The 2011 CBA defined "Baseline Benefit" as the Normal Retirement Pension amount in effect under the Pension Plan prior to the additions of benefit increase amounts, as adjusted for future increases in the cost-of-living in the manner provided for in Section 415(d)(2) of the IRS Code. *See* C-17-000003.

76.     The 2011 CBA provided that any increase in the New Monthly Benefit shall be effective for all players as of the first day of the month following the beginning of the Plan Year of the Pension Plan to which the increase relates (the "New Benefit Increase Commencement Date"). *See* C-17-000003.

77.     The 2011 CBA reflects several cost-of-living adjustments to the Normal Retirement Pension from $333.14 as of March 1, 2001 to the $518.92 as of December 8, 2011.

78.      The 2011 CBA offered no guidance as to how future cost-of-living increases to the Normal Retirement Pension might otherwise affect the mathematical calculation of the benefit of equivalent value for Lump Sum, Fixed Amounts, or Fixed Period.

79.     On January 19, 2017, the NBPA and NBA entered into a collective bargaining agreement effective July 1, 2017 (the "2017 CBA").

80.     The <u>2017 CBA</u> identified the "Current Benefit" as of January 19, 2017 at $572.12 per month for each year of credited service payable in accordance with the provisions of the pension plan. *See* C-18-000003.

81.     As set forth above, in 1976, the Plan implemented provisions providing for COLAs to the Normal Retirement Pension.

82.     In summary, from 1988 to the present, the Plan has increased the Normal Retirement Pension from $200.00 per month for each year of credited service to $572.12 per month for each year of credited service; in other words, the Plan has increased the Normal Retirement Pension by more than 186% over the last twenty-nine years.

83.     Each increase to the Normal Retirement Pension necessarily increased the benefit of equivalent value payable to pensioners who elected to receive an Actuarial Equivalent, including Lump Sum, Fixed Amount, or Fixed Period.

84.     Notwithstanding each increase to the Normal Retirement Pension, the Plan has not provided an actual benefit of equivalent value to those pensioners who elected to receive a time-limited Actuarial Equivalent, once the time limit expired.

85.     The Plan violates ERISA and IRS regulations federally mandating that a pensioner must receive the Actuarial Equivalent when compared to pensioners who elect to receive a Life Annuity payable until death.

**<u>The Plan's Failure to Pay Full Benefits of Equivalent Value Cost</u>**
**<u>Plaintiff's Family Hundreds of Thousands of Dollars in Loss of Retirement Benefits</u>**

86.     Plaintiff Zaid Abdul-Aziz was drafted into the NBA on June 4, 1968 by the Cincinnati Royals and made his NBA debut on October 16, 1968.

87.     Abdul-Aziz played for ten (10) seasons in the NBA from 1968 through 1978 and received eight (8) years of credited service.

88.     Abdul-Aziz played and retired under the 1970 Plan, 1976 Plan, and 1978 Plan, respectively.

89.     Abdul-Aziz retired from the NBA after his release by the Houston Rockets on June 20, 1978.

90.     Plaintiff's Normal Retirement Date was set for May 1996, and his Early Retirement Date was set for May 1991.

91.     In May 1991, Plaintiff applied to receive Early Retirement Benefits and signed his application for retirement benefits on June 22, 1991 under the 1989 Plan ("Retirement Application").  *See* C-24-000004-07.

92.     Under the 1989 Plan, the Normal Retirement Pension payable upon his Normal Retirement Date was set at $200.00 per month for each year of credited service.  *See* C-6-000017.

93.     Abdul-Aziz was presented with a Benefit Calculation Worksheet at the time he and his wife selected his retirement pension benefits ("Benefit Calculation Worksheet").  *See* C-24-000008-09.

94.     The Benefit Calculation Worksheet evidenced a "**Benefit Calculation Payable at Normal Retirement Date**" of May 1996 at $200.00 per month for each year of credited service, or $1,600.00 per month beginning May 1996.  *See* C-24-000008.

95.     In addition to the Normal Retirement Pension, the Benefit Calculation Worksheet calculated Abdul-Aziz's Early Retirement Pension, payable for life, as follows:

a.     **Early Retirement Benefit**: $1,600.00 x .667 = $1,067.20/ month for life

*See* C-24-000009.

96.     The Benefit Calculation Worksheet presented Plaintiff with two Actuarial Equivalents:

14

a.     **Lump Sum Payment**: PBGC Rate 7.25% at $1,600.00 x 136.85 = $218,960.00; and

b.     **10 Year Certain Only Beginning on Early Retirement Date of 05/01/91 and ending 04/30/01**: $1,067.20 x 1.699 = $1,813.17/month for 10 years.

*See* C-24-000009.

97.     The Retirement Application offered no guidance as to how future cost-of-living increases to the Normal Retirement Pension might otherwise affect the mathematical calculation or value for an Actuarial Equivalent in the form of Lump Sum, Fixed Amounts, or Fixed Period.

98.     The Benefit Calculation Worksheet also offered no guidance as to how future cost-of-living increases to the Normal Retirement Pension might otherwise affect the mathematical calculation or value for an Actuarial Equivalent in the form of Lump Sum, Fixed Amounts, or Fixed Period.

99.     Moreover, the 1989 Plan offered no guidance as to how future cost-of-living increases to the Normal Retirement Pension might otherwise affect the mathematical calculation of the benefit of equivalent value for an Actuarial Equivalent in the form of Lump Sum, Fixed Amounts, or Fixed Period.

100.     In fact, no provision contained within the 1989 Plan, Retirement Application, or Benefit Calculation Worksheet expressly advised Abdul-Aziz and his wife that they would forever forfeit their pension rights to future COLA increases to the Normal Retirement Application, which ERISA and IRS Code regulations prohibit anyway.

101.     Abdul-Aziz and his wife elected to receive a Fixed Period-Actuarial Equivalent in the form of monthly installments for ten (10) years payable at $1,813.17 per month. *See* C-24-000004-07.

102.    The Plan accepted Plaintiff's Retirement Application on July 12, 1991.  *See* C-19-000001.

103.    Due to the timing of the application's acceptance, Plaintiff received a letter from the Plan dated July 12, 1991, stating that he would begin to receive $1,851.64 per month from the Plan beginning on August 1, 1991 and ceasing on July 31, 2001.  *See* C-19-000001.

104.    Thereafter, the NBA and NBPA entered into the <u>1995 CBA</u> and amended the Normal Retirement Pension in the 1996 Plan to $285.00 per month for each year of credited service beginning September 1, 1996.  *See* Paragraphs 30 – 43 *supra*.

105.    On September 1, 1996, Plaintiff began to receive $2,479.53 per month to reflect the $285.00 increase to defined monthly benefit and the cost-of-living adjustments to the federal maximum benefit limitations applicable to the 1996 Plan.  *See* C-20-000001, C-24-000012.

106.    On January 1, 1997, Plaintiff began to receive $2,582.91 per month to reflect similar changes to defined monthly benefit and cost-of-living adjustments.  *See* C-24-000002.

107.    On January 1, 1998, Plaintiff began to receive $2,686.22 per month to reflect similar changes to the defined monthly benefit and cost-of-living adjustments.  *See* C-24-000002.

108.     On January 1, 2000, Plaintiff began to receive $2,789.58 per month to reflect similar changes to the defined monthly benefit and cost-of-living adjustments.  *See* C-24-000002.

109.    On January 1, 2001, Plaintiff began to receive $2,892.88 per month to reflect similar changes to the defined monthly benefit and cost-of-living adjustments.  *See* C-24-000002.

110.    In a letter dated June 3, 2015, the Plan admitted that the aforementioned increases resulted from COLA increases to the underlying Normal Retirement Pension ("During the remainder of the fixed payment period, the monthly payment amounts were increased periodically to reflect collective-bargained for benefit formula increases and/or cost of living adjustments to the federal maximum benefit limitation applicable to the Plan.")  *See* C-24-000001-03.

111.    On August 31, 2001, Plaintiff's retirement benefits ceased upon the expiration of the ten (10) year Fixed Period pension.

112.    Nothing contained within the <u>1989 Plan</u>, <u>Retirement Application</u>, or <u>Benefit Calculation Worksheet</u> advised Plaintiff that pensioners electing to receive a Normal Retirement Pension would continue to receive significant financial benefits, while those pensioners electing to receive a form of pension terminating prior to the player's death would not receive the Actuarial Equivalent, as otherwise guaranteed under the Plan, and which is further expressly forbidden by ERISA and IRS Code regulations.

113.    Following cessation of retirement benefits on August 31, 2001, the Plan has not provided Plaintiff with information or documentation regarding any revisions to the Normal Retirement Pension from 2001 through the present.

114.    Considering the 2005, 2011, and 2017 Collective Bargaining Agreements, respectively, along with passing several revised versions of the Plan in 2009, 2014, and 2017, respectively, Plaintiff has not, in fact, received the Actuarial Equivalent of the Normal Retirement Pension given the last twenty-nine years of COLA increases.

115.    Each Collective Bargaining Agreement and revised Plan afforded a tremendous financial benefit and windfall to those NBA pensioners who elected to receive a Normal Retirement Pension in the form of a Life Annuity.

116.    On the other hand, the Plan has provided no monetary benefits to Plaintiff and other putative class members who elected an Actuarial Equivalent that terminated sometime prior to the player's death.

117.    For example, from August 1991 through August 2001, Plaintiff received ten years of defined monthly installments totaling $273,098.72, which amount should have represented the

17

benefit of equivalent value if Plaintiff had elected to receive a Normal Retirement Pension payable from his Normal Retirement Date in May 1996.

118.    Today, the maximum monthly benefit for those pensioners who elected to receive a Normal Retirement Pension is $572.12 per month for each year of credited service; therefore, assuming Plaintiff's eight years of credited service, the COLA increases to the Normal Retirement Pension means that Plaintiff would be receive $4,576.96 per month for life.

119.    At $4,576.96 per month, Plaintiff would only have to live another five (5) years from today's date to receive the entire $273,098.72 he received *en toto* over the entire ten (10) year period from August 1991 – August 2001.  This does not even begin to calculate the loss of hundreds of thousands of dollars in retirement benefits if one assumes Plaintiff would have also received from his Normal Retirement Date in May 1996 through June 2017, an additional period of over twenty-one (21) years in lost retirement benefits.

120.    Even the most basic of mathematical calculations clearly establishes that the Plan's failure to pay Plaintiff and the putative class a true and correct benefit of equivalent value equal to and commensurate with the COLA increases to the Normal Retirement Pension has cost Plaintiff and his family hundreds of thousands of dollars in loss of retirement benefits.

**ERISA and IRS Code Regulations Federally Mandate that Pensioners Who Receive Their Pension in the Form of an Actuarial Equivalent Must Receive the Same Financial Benefits as Life Annuitants**

121.    ERISA § 502(a)(1)(B) provides that in the case of a defined benefit plan, a plan participant may bring a civil action to recover benefits due him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

122.    ERISA § 204(c)(3), (g) (the "Anti-Cutback Rule") provides that in the case of a defined benefit plan, if any employee's accrued benefit is to be determined as an amount other

than an annual benefit commencing at the normal retirement age, then the employee's accrued benefit shall be the actuarial equivalent of the annual benefit.

123. "The term 'accrued benefit' means in the case of a defined benefit plan, the individual's accrued benefit determined under the plan and, except as provided in section 1054(c)(3) of this title, expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23) and Internal Revenue Code, 26 U.S.C. § 411(a)(7). *See* C-28-000006.

124. "If an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, or if the accrued benefit derived from contributions made by an employee is to be determined with respect to a benefit other than an annual benefit in the form of a single life annuity (without ancillary benefits) commencing at normal retirement age, the employee's accrued benefit…shall be the actuarial equivalent of such benefit or amount determined under paragraph (1) or (2)." 29 U.S.C. § 1054(c)(3) and Internal Revenue Code, 26 U.S.C. § 411(c)(3). *See* C-28-000014.

125. IRS regulations further provide that the "present value of any optional form of benefit cannot be less than the present value of the normal retirement benefit…." Treasury Reg. 1.417(e)-1(d). *See* C-29-000005.

126. An "accrued benefit" within the meaning of ERISA at 29 U.S.C. §§ 1002(23)(A) & 1054(c)(3) includes defined benefit pension annuities and cost-of-living adjustments commencing at normal retirement age.

127. Cost-of-living adjustments, or COLAs, are inseparably tied to the monthly retirement benefit and thus constitute an accrued benefit and not an ancillary or supplementary benefit. 26 C.F.R. § 1.411(d)-3(g)(6). *See* C-30-000017-18.

128.     ERISA further requires that "alternate forms" of pension payment must be the "actuarial equivalent" of the accrued benefit pursuant to 29 U.S.C. §§ 1054(c)(3) and 26 U.S.C. § 411(c)(3).  *See* C-28-000013-14.

129.     ERISA and IRS Code regulations provide that if a defined benefit pension plan provides a cost-of-living adjustment, it must similarly provide the actuarially-determined benefit of equivalent value to all holders of alternate forms of pension.

130.     By violating ERISA and IRS Code regulations as described above, Defendants have caused members of the Class to receive pension payments in amounts far less than they would have received had they chosen the Life Annuity option.

131.     As a result, Plaintiff and all putative class members have been injured.

## COUNTS

### Count I – Violation of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) Liability for Pension Benefits Owed Under the Plan

132.     Plaintiff brings this civil class action under ERISA § 502(a)(1)(B) for several reasons: (1) to recover the benefits of equivalent value associated with prior COLA increases to the Normal Retirement Pension; (2) to enforce their rights under the terms of the plan through injunctive relief requiring recalculation of actuarially-determined benefits due under the Plan, and (3) to clarify their rights to any future benefits of equivalent value arising by virtue of future COLA increases to the Normal Retirement Pension under the terms of the plan.

133.     Plaintiff Abdul-Aziz and the putative class, who elected to receive an Actuarial Equivalent terminating prior to the player's death, such as Lump Sum, Fixed Amounts, and Fixed Period, have not received benefits of equivalent value as guaranteed under the Plan.

134.     Over the last twenty-nine years, the Plan has granted significant COLA increases to Life Annuity recipients, but have failed to provide a benefit of equivalent value to Lump Sum, Fixed Amounts, and Fixed Period pensioners.

**Count II – Violation of ERISA § 204(c)(3), (g), 29 U.S.C. § 1054(c)(3), (g)**
**Breach of ERISA's Anti-Cutback Rule**

135.    Plaintiff brings this civil class action under ERISA § 204(c)(3), (g) where the Plan, a defined benefit plan, has failed to pay the actuarial equivalent of an accrued benefit, as an amount other than an annual benefit commencing at normal retirement age.

136.    The Plan has failed to pay the actuarial equivalent of the annual benefit commencing at Early or Normal retirement age to Plaintiff and the putative class members, who elected to receive an optional form of pension under the Plan that terminated prior to their deaths.

## CLASS ACTION ALLEGATIONS

137.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(2), consisting of all former participants of the Plan, who elected to receive an Actuarial Equivalent that terminated sometime prior to the player or his beneficiary's death, if applicable, including but not limited to Lump Sum, Fixed Amounts, and Fixed Period; and who did not receive a benefit of equivalent value because his or her Actuarial Equivalent terminated prior to said increase to the monthly benefit payable pursuant to the Normal Retirement Benefit ("Class").

138.    The Class is so numerous that joinder of all putative class members is impracticable.  Upon information and belief, as of July 2015, there were an estimated 1,500 living former NBA basketball players who were out of the NBA league years before the salary and endorsements explosion of the modern era; therefore, many of these NBA players depend upon the income provided by the Plan.  Moreover, there are other additional players who played in the modern era, including approximately 450 players on the 2016-17 opening day roster, who rights to future benefits will depend upon the outcome of this class action for declaratory judgment and injunctive relief.

139.     Common questions of law and fact exist as to all members of Class where the right to recover the benefits of equivalent value associated with prior COLA increases to the Normal Retirement Pension depend upon a uniform interpretation and application of the Plan and ERISA and the IRS Code; where the right to seek injunctive relief requiring recalculation of actuarially-determined benefits due under the Plan is applicable to all members of the Class, and clarification of the Class' rights to any future benefits of equivalent value arising by virtue of future COLA increases to the Normal Retirement Pension depends upon a uniform interpretation and application of the Plan and ERISA and the IRS Code.

140.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by the Plan's language, interpretation, and payment schedules.

141.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff and all other retired NBA players have a vested interest in seeing the Plan properly drafted, interpreted, and applied in accordance with ERISA and the IRS Code.  Plaintiff's counselors have many years of complex litigation and class action in federal district and appellate courts.

142.     This class action is appropriate to certification under Rule 23(b)(1)(A) where prosecuting separate actions by or against individual class members could create inconsistent and varying adjudications with respect to the uniform interpretation and application of the Plan and ERISA and the IRS Code, thereby establishing incompatible standards of conduct by the Plan, specifically how to properly calculate a benefit of equivalent value for an Actuarial Equivalent.

143.     This class action is appropriate to certification under Rule 23(b)(1)(B) where adjudications with respect to individual class members would be dispositive of the interests of the

other members of the Class not parties to this action, where injunctive relief, if granted, could order recalculation of benefits payable to the entire Class.

144.   This class is appropriate to certification under Rule 23(b)(2) where the Plan has acted and refused to act on grounds that apply generally to the Class.  The Plan does not believe that Plaintiff is entitled to receive a benefit of equivalent value, despite the necessary mathematical increase to the Actuarial Equivalent resulting from twenty-nine years of systematic COLA increases to the Normal Retirement Pension.  Accordingly, Plaintiff filed this class action suit for declaratory judgment and injunctive relief to ensure that the Court declares the participant's entitlements to rights arising under the Plan and issues final injunctive relief ordering recalculation of retirement benefits for all members of Class financially harmed by the Plan.

**STATUTE OF LIMITATIONS**

145.   ERISA does not prescribe a limitations period for actions arising under § 1132; therefore, the controlling limitations period is that specified in the most nearly analogous state limitations statute.  The state limitations statute most analogous to §§ 502(a)(1)(B) and 204(c)(3), (g) claims for wrongful denial of benefits is that for contract actions.  The Plan is governed by the laws of the State of New York; therefore, the state's six-year statute of limitations for contract actions applies.

146.   An ERISA cause of action under §§ 502(a)(1)(B) and 204(c)(3), (g) accrues, and thus, the statute of limitation begins to run, when an employee benefit plan clearly and unequivocally repudiates a beneficiary's claim for benefits under the plan.  The beneficiary must also have actual or constructive notice of the repudiation of his or her claim.  In addition, although a limitations period generally begins to run when an employee benefit plan denies a

beneficiary's formal application for benefits, a repudiation may occur regardless of whether the

beneficiary has filed a formal application for benefits.

147.   Plaintiff alleges that his ERISA cause of action did not begin to accrue until June

3, 2015, whereupon Plaintiff received a letter from the NBA advising him that he had no rights

under the Plan because he accepted an Actuarial Equivalent payable in monthly installments for

10 years.  *See* C-24-000001-03.

148.   On April 26, 2015, Plaintiff, through an attorney, issued a letter to the NBA

Benefits Department.   With limited information, Plaintiff's attorney believed that the NBA

purchased all of Abdul-Aziz's lifetime pension benefits in exchange for a payment that was less

than the amount he would have received without such buy-out transaction.   Plaintiff's attorney

requested file information to examine Plaintiff's entitlement to an NBA pension.   *See* C-23-

000001-03.

149.   In response, on June 3, 2015, the NBA, through Caroline H. Cheng, Associate

Counsel, issued a written letter; therein, Ms. Cheng stated wrote:

> Mr. Abdul-Aziz elected to receive his pension benefits in the form of installments paid over a ten (10) year fixed period commencing on August 1, 1991 and ending July 31, 2001.  He made his election after the Plan provided him with a benefit illustration that described each potential form of payment under the Plan, ***as well as the amount he would receive under each potential form of payment under the Plan***.   Mr. Abdul-Aziz's benefit application explained that: (a) the form of payment he elected would provide monthly payments over a fixed period; (b) upon the expiration of the fixed period, all benefits would cease; and (c) the payments over the fixed period ***would equal the entire amount of his pension benefits***.

*See* C-24-000001-03.

150.   The NBA letter dated June 3, 2015 constituted the first clear repudiation of any

additional benefits owed under the Plan.

151.   Notwithstanding, Plaintiff contends that Ms. Cheng's letter on behalf of the NBA

is overly misleading and entirely silent with respect to Plaintiff's entitlement to an actuarial

equivalent when a COLA increase is applied to a Normal Retirement Pension.

24

152.   Ms. Cheng's letter never addressed the fact that ERISA and the IRS Code require that the "present value of any optional form of benefit cannot be less than the present value of the normal retirement benefit…."  Treasury Reg. 1.417(c)-1(d); that an "accrued benefit" within the meaning of ERISA at 29 U.S.C. §§ 1002(23)(A) & 1054(c)(3) includes defined benefit pension annuities and cost-of-living adjustments commencing at normal retirement age; that cost-of-living adjustments, or COLAs, are inseparably tied to the monthly retirement benefit and thus constitute an accrued benefit and not an ancillary or supplementary benefit.  26 C.F.R. § 1.411(d)-3(g)(6); or that ERISA further requires that "alternate forms" of pension payment must be the "actuarial equivalent" of the accrued benefit pursuant to 29 U.S.C. §§ 1054(c)(3) and 26 U.S.C. § 411(c)(3).

153.   For the above and foregoing reasons, Plaintiff respectfully contends that that statute of limitations date for his ERISA cause of action is June 3, 2021; therefore, Plaintiff's claim is not time-barred.

154.   In the alternative, only, Plaintiff alleges that his ERISA cause of action would re-accrue at each and every COLA increase to the Normal Retirement Date because of the necessary mathematical increase to the benefit of equivalent value due under the Plan for an Actuarial Equivalent.  The 2011 CBA was entered on December 8, 2011, which six years from said date is December 8, 2017; therefore, Plaintiff ERISA cause of action for increased benefits due under the Plan is not time-barred for all COLA increases implemented after December 8, 2011.

155.   Finally, in the alternative, only, Plaintiff claims that his ERISA cause of action is not time-barred as he is entitled to seek a declaration of his future benefits arising under the plan pursuant to § 502(a)(1)(B), which expressly provides that a plan participant may file a civil action to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.  Plaintiff claims in the alternative, only, that he and all Class members are entitled to a benefit of equivalent value with each and every COLA increase to the Normal

Retirement Pension; therefore, Plaintiff's ERISA cause of action is not time-barred where this civil class action seeks a declaration of future rights for Plaintiff and all members of the Class with respect to any future COLA increase to the Normal Retirement Pension.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for declaratory judgment and injunctive relief, as follows:

A.      Determining whether this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

B.      Declaring that the Plan violated ERISA §§ 204(c)(3), (g), 502(a)(1)(B) and applicable IRS Code regulations by failing to pay cost-of-living adjustments to pensioners electing to receive an Actuarial Equivalent that terminated prior to the player or his spouse's death, if applicable;

C.      Declaring that the Plaintiff and Class who accepted an Actuarial Equivalent were entitled to receive a true and accurate benefit of equivalent value under Article I, Section 1.2 of the Plan with each prior cost-of-living adjustment to the Normal Retirement Pension;

D.      Declaring that the Plaintiff and Class who accepted an Actuarial Equivalent remain entitled to receive a true and accurate benefit of equivalent value under Article I, Section 1.2 of the Plan with each future cost-of-living adjustment to the Normal Retirement Pension;

E.      Render final judgment in the form of injunctive relief, requiring the Plan to perform a complete actuarially-determined calculation of the true and accurate benefit of equivalent value under Article I, Section 1.2 of the Plan;

F.      Render final judgment in the form of injunctive relief, requiring the Plan to remit payments to the Plaintiff and Class for all past and future benefits of equivalent value as actuarially-determined and calculated by the Plan;

G.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

H.      Such other and further equitable relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:                                    Respectfully submitted,


                                          _____s/Jason L. Melancon_____.
                                          Jason L. Melancon, Esq. (SBN 28152)
                                          Robert C. Rimes, Esq. (SBN 28740)
                                          R. Lee Daquanno, Jr., Esq. (SBN 36430)
                                          MELANCON | RIMES, LLC
                                          6700 Jefferson Hwy., Building 6
                                          Baton Rouge, LA 70806
                                          Telephone: (225) 303-0455
                                          Facsimile: (225) 303-0459
                                          Email: jason@melanconrimes.com

                                          *Counsel for Plaintiff*

27