UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                                                  :

ZAID ABDUL-AZIZ, *Individually and on behalf of all others similarly situated*,   :

                                                 Plaintiff,   :     17-CV-8901 (VSB)

                    - against -   :     **OPINION & ORDER**

NATIONAL BASKETBALL ASSOCIATION : 
PLAYERS' PENSION PLAN,   :

                                               Defendant.   :
-------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/20/2019

Appearances:

Jason Luke Melancon
Melancon Rimes
Baton Rouge, LA
*Counsel for Plaintiff*

Myron D. Rumeld (New York, NY)
Neil V Shah (Newark, NJ)
Proskauer Rose LLP

Brian Joseph LaClair (Syracuse, NY)
Jules L. Smith (Rochester, NY)
Blitman & King LLP
*Counsel for Defendant*

VERNON S. BRODERICK, United States District Judge:

      Plaintiff Zaid Abdul-Aziz brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq.*, asserting claims for unpaid retirement benefits under the National Basketball Association Players' Pension Plan ("Defendant" or the "Plan"). Before me is Defendant's motion to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Because I find

that Plaintiff's claim is barred by the applicable statute of limitations, Defendant's motion to dismiss is GRANTED.

I.  **Background**[1]

The National Basketball Association ("NBA") Players' Pension Plan provides defined retirement benefits to retired NBA players. (Doc. 1 ("Compl."), ¶ 6.) Plaintiff Zaid Abdul-Aziz played for the NBA from 1968 to 1978, and received eight years of credited service toward his retirement. (*Id.* ¶ 5.) Plaintiff's retirement date was set for May 1996, but he applied for early retirement benefits in May 1991. (*Id.* ¶¶ 90–91.)

Under the Plan, participants may elect a "Normal Retirement Pension"—a monthly benefit commencing "on the first day of the first month following the player's Normal Retirement Date and continuing to be paid on the first day of each month up to and including the month in which the player dies"—i.e., a life annuity—or a number of other forms of benefit payments. (*See id.* ¶¶ 11–15.) One of these options is "Installments for a Fixed Period," which are "[p]aid in equal monthly installments for a fixed number of years." (Doc. 1-1, § 3.9(c).) Each of these alternative payment options provides a benefit that is the "Actuarial Equivalent" of the participant's Normal Retirement Pension. (*Id.* § 3.9.)

Plaintiff submitted his Application for Retirement Benefits on June 22, 1991, and elected to receive his benefit in the form of "Installments for a Fixed Period"; specifically, he chose the "10 Year Certain Only" option. (Doc. 1-28, at 5.) The application explained to Plaintiff that by selecting "Installments for a Fixed Period":

> A benefit will be paid for a fixed number of payments, for the period you select

---

[1] The following factual summary is drawn from the allegations of the Complaint and exhibits attached or incorporated by reference thereto, (Doc. 1), unless otherwise indicated. I assume the allegations in the Complaint to be true for purposes of this motion. *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). My references to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

(e.g., 5 years, 10 years). Upon the expiration of this period, all benefits will cease. The total of all payments you receive will equal the entire value of your retirement benefit.

(*Id.*) Under the version of the Plan in effect at the time Plaintiff applied for retirement benefits, each plan participant who had not yet begun to receive benefits under the Plan was entitled to a Normal Retirement Pension in the amount of $200 per month for each year of credited service. (Compl. ¶ 37.) At that time, the Plan contained no provisions for future increases to this benefit amount, including any increases resulting from cost-of-living adjustments ("COLAs").[2] (Compl. ¶¶ 97–99.)

Plaintiff, who had been credited with eight years of service, would therefore have received a Normal Retirement Pension of $1,600 per month for life ($200 x 8 years of service), if he retired at age 50. (*Id.* ¶ 94.) Because Plaintiff had elected to retire early, however, this amount was reduced by approximately 1/3, resulting in a life annuity of $1,067.20 per month. (*Id.* ¶ 95.) The Actuarial Equivalent of that amount under the 10 Year Certain Only option that Plaintiff elected was $1,813.17 per month for a period of ten years. (*Id.* ¶ 96(b).) On July 12, 1991, the Plan sent a letter to Plaintiff confirming receipt of his Application for Retirement Benefits, and informing Plaintiff that he would begin "receiving monthly payments of $1,851.64[3] from this Plan beginning on August 1, 1991. Since [he] elected to receive [his]

---

[2] The Internal Revenue Code provides for periodic cost-of-living adjustments, which increase the maximum annual benefit that may be paid to pension plan participants under federal law. *See* 26 U.S.C. §§ 415(b), (d). Plans are permitted, but not required, to incorporate by reference these cost-of-living adjustments into the plans' benefit calculations. *See* 26 C.F.R. § 1.415(a)-1(d)(3) ("A plan is permitted to incorporate by reference the limitations of section 415.").

[3] It appears that the amount of Plaintiff's monthly benefit increased from $1,813.17 to $1,851.64 due to the time lag between the date on which Plaintiff requested his Application for Retirement Benefits and the date on which he ultimately began receiving those benefits. The Benefit Calculation in Plaintiff's application assumed that Plaintiff would begin receiving his 10 Year Certain Only payments on May 1, 1991, but Plaintiff actually did not begin receiving payments until August 1, 1991, thereby slightly reducing his early retirement penalty. (*See* Doc. 1-28, at 9; Doc. 1-23.)

benefit in the form of the 10 Year Certain Only, [he would] cease receiving a benefit from this Plan on July 31, 2001." (Doc. 1-23.) Between August 1, 1991 and August 31, 1996, Plaintiff received a monthly benefit payment in the amount of $1,851.64. (*See* Doc. 1-28, at 2.)

Effective September 1, 1996, the Plan was amended as a result of a 1995 collective bargaining agreement ("1995 CBA"), (Compl. ¶ 42), "to reflect the Maximum Monthly Benefit change[] made pursuant to the 1995 CBA," (*id.* ¶ 49). The resulting "1996 Plan" increased the Normal Retirement Pension from $200 to $285 per month for each year of credited service. (*Id.* ¶ 51.) This increased benefit applied to participants who had not yet begun to receive benefits as of September 1, 1996, as well as existing Plan participants who, like Plaintiff, were already receiving a monthly benefit. (*Id.* ¶ 46.) Pursuant to the negotiated terms of the 1995 CBA, the 1996 Plan also provided that in each subsequent year, the Normal Retirement Pension would be "adjusted for increases in the cost of living in the same manner as the cost of living adjustment for the dollar limitation under [26 U.S.C.] section 415(b)(1)(A)." (Doc. 1-18, Art. IV § 1(a)(1)(i)(C).) This language incorporates by reference the COLAs set forth in the Internal Revenue Code ("IRC"), which annually increase the maximum amount that may be paid to pension plan participants under federal law. *See* 26 U.S.C. §§ 415(b), (d). The various benefit increases under the 1996 Plan applied "only with respect to benefit payments made on or after September 1, 1996 and [did] not require the recalculation of benefit payments made prior to such date." (Doc. 1-9, § 3.2(k)(ii); *see also* Doc. 1-18, Art. IV § 1(a)(1)(i)(D).)

As a result of the 1996 Plan, on September 1, 1996, Plaintiff's monthly benefit increased to $2,479.53. (Compl. ¶¶ 104–05.) In a letter dated October 30, 1997, the Plan confirmed that "[e]ffective September 1, 1996, [Plaintiff's] monthly benefit was increased to $2,479.53 pursuant to the [1995] Collective Bargaining Agreement." (Doc. 1-24.) The letter further reminded

4

Plaintiff that "[h]is benefits [we]re scheduled to cease July 31, 2001." (*Id.*) In accordance with the 1995 CBA and subsequent collective bargaining agreements, Plaintiff's monthly benefit continued to periodically increase between 1997 and 2001 such that Plaintiff's final monthly payment in July 2001 was $2,892.88. (Compl. ¶¶ 106–09.)

On April 26, 2015—nearly fourteen years after Plaintiff received his final monthly benefit under the 10 Year Certain Only payment plan—Plaintiff, through an attorney, sent a letter to the Plan asserting that "the NBA purchased all of [Plaintiff's] lifetime pension benefits in exchange for a payment that was less than the amount he would have received without such buy-out transaction." (*Id*. ¶ 148.) On June 3, 2015, the Plan responded that Plaintiff's pension benefits "were paid in full over the period from August 1, 1991 through July 31, 2001" and that Plaintiff therefore had no further rights under the Plan. (Doc. 1-28, at 1–2.)

## II. **Procedural History**

Plaintiff filed his Complaint, individually and on behalf of all others similarly situated, on November 15, 2017. (Doc. 1.) The Complaint alleges two causes of action: first, that the Plan violated ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), by failing to include in Plaintiff's benefit calculation COLAs that the Plan awarded to participants who elected to receive a life annuity, (Compl. ¶¶ 132–34); and second, that the Plan breached ERISA's anti-cutback rule, § 204(c)(3) and (g), 29 U.S.C. § 1054(c)(3) and (g), by failing to provide the Actuarial Equivalent of the Normal Retirement Pension to Plaintiff and other individuals who elected to receive an optional form of benefit payments that terminated prior to their deaths, (Compl. ¶¶ 135–36).

On March 2, 2018, the Plan filed its motion to dismiss, including a memorandum of law in support. (Docs. 21–22.) On April 4, 2018, Plaintiff filed his opposition to Defendant's

5

motion to dismiss, (Doc. 25), and Defendant filed its reply on May 25, 2018, (Doc. 26). On June 11, 2018, I denied Plaintiff's subsequent request for leave to file a sur-reply. (Doc. 29.)

## III. Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*, 496 F.3d at 237. A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

Finally, a complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

## IV. Discussion

Defendant contends (1) that Plaintiff's claims pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), and ERISA § 204(c)(3) and (g), 29 U.S.C. § 1054(c)(3) and (g), are time-barred; and (2) that, as a matter of law, such claims fail to state a claim upon which relief may be granted. Since I find that Plaintiff's claims are untimely, I do not reach Defendant's challenge to those claims on the merits.

### A. *Applicable Law*

"The lapse of a limitations period is an affirmative defense that a defendant must plead and prove. However, a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (internal citation omitted). ERISA does not provide a statute of limitations; "[t]herefore, the applicable limitations period is that specified in the most nearly analogous state limitations statute." *Burke v. PriceWaterHouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76, 78 (2d Cir. 2009) (internal quotation marks omitted). "Under the New York Civil Practice Law and Rules, an action under a contract—for employee benefit plans, in effect, are contracts—must be commenced within six years." *Hirt v. Equitable Ret. Plan for Emps.*, 450 F. Supp. 2d 331, 333 (S.D.N.Y. 2006) (citing N.Y. C.P.L.R. § 213), *aff'd*, 285 F. App'x 802 (2d Cir. 2008). Thus, New York's six-year limitations period for contract actions governs this ERISA action. *See Burke*, 572 F.3d at 78 (determining that the limitations period for contract actions "is most analogous to § 1132 actions"); *Hirt*, 450 F. Supp. 2d at 333 (applying six-year limitations period to actions pursuant to 29 U.S.C. § 1054).

"[A] cause of action under ERISA accrues upon a clear repudiation by the plan that is known, or should be known, to the plaintiff—regardless of whether the plaintiff has filed a

formal application for benefits." *Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension Plan*, 201 F.3d 44, 49 (2d Cir. 1999); *see also Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516, 521 (3d Cir. 2007) ("[C]lear repudiation . . . does not *require* a formal denial to trigger the statute of limitations"; rather, repudiation occurs "when a beneficiary knows or should know he has a cause of action." (emphasis in original)). Where a plaintiff's claim is predicated on an underpayment of benefits, the claim accrues when the plaintiff is "put on notice that the defendants believed the method used to calculate his [] pension was correct." *Novella v. Westchester Cty.*, 661 F.3d 128, 144 (2d Cir. 2011) (internal quotation marks omitted). The Second Circuit has determined that "notice of a miscalculation can be imputed to a [recipient of benefits]—and the statute of limitations will start to run—when there is enough information available to the [recipient] to assure that he knows or reasonably should know of the miscalculation." *Id.* at 147; *see also DePasquale v. DePasquale*, No. 12-CV-2564 (RRM)(MDG), 2013 WL 789209, at *13 (E.D.N.Y. Mar. 1, 2013) ("The statute of limitations begins to run when the plaintiff discovers, or with due diligence should have discovered, the injury that is the basis of the litigation."), *aff'd*, 568 F. App'x 55 (2d Cir. 2014).

**B.** *Application*

The parties agree that New York's six-year statute of limitations for breach of contract governs Plaintiff's claims. (*See* Def.'s Br. 9; Pl.'s Opp'n 19.)[4] They disagree, however, as to when that limitations period began to run. Defendant argues that Plaintiff's claim accrued—at the latest—by July 31, 2001, when Plaintiff stopped receiving benefit payments from the Plan. (Def.'s Br. 9.) Plaintiff, by contrast, contends that the limitations period did not begin to run

---

[4] "Def.'s Br." refers to the Memorandum of Law in Support of Defendant National Basketball Association Players' Pension Plan's Motion to Dismiss the Complaint, filed March 2, 2018, (Doc. 22). "Pl.'s Opp'n" refers to the Memorandum of Law in Response to Defendant National Basketball Association Players' Pension Plan's Motion to Dismiss the Complaint, filed April 4, 2018, (Doc. 25).

8

until June 3, 2015, when the Plan formally denied his claim for additional benefits. (Pl.'s Opp'n 19.)

The exhibits attached to the Complaint demonstrate that beginning as early as June 22, 1991—when Plaintiff elected to receive his benefit payments for a fixed period—and repeatedly thereafter by letter, the Plan advised Plaintiff that his benefit payments would cease entirely in July 2001. First, the Application for Retirement Benefits that Plaintiff completed on June 22, 1991 informed Plaintiff that the "Installments for a Fixed Period" payment option that he selected meant that "[a] benefit will be paid for a fixed number of payments, for the period you select (e.g., 5 years, 10 years). Upon the expiration of this period, all benefits will cease." (Doc. 1-28, at 5.) Similarly, the July 12, 1991 letter confirming receipt of Plaintiff's application explained, "Since you elected to receive your benefit in the form of the 10 Year Certain Only, you will cease receiving a benefit from this Plan on July 31, 2001." (Doc. 1-23.)

Moreover, even after Plaintiff's benefit payments began to increase annually following the Plan's incorporation of the IRC's cost-of-living adjustments, the Plan continued to advise Plaintiff that all payments—including the COLAs Plaintiff began to receive in September 1996—would cease on July 31, 2001. (*See, e.g.*, Doc. 1-24 (October 30, 1997 letter informing Plaintiff that, as of September 1, 1996, his monthly benefit increased to $2,479.53 but that his benefit payments were still "scheduled to cease" entirely on July 31, 2001).)[5] These statements are unambiguous. While Plaintiff attempts to distinguish between the "Actuarial Equivalent"

---

[5] Because this 1997 letter—which was sent after the Plan incorporated into its prospective benefit calculations the periodic COLAs set forth in 26 U.S.C. § 415(d)—clearly informed Plaintiff that he would receive no additional benefit payments after July 31, 2001, Plaintiff's claims arguably accrued long before he stopped receiving monthly benefit payments. *See Novella*, 661 F.3d at 144 (holding that a claim accrues when the plaintiff is "put on notice that the defendants believed the method used to calculate his [] pension was correct"). However, I need not make such a finding because even assuming the six-year limitations period did not begin to run until July 31, 2001, it expired long before Plaintiff filed the instant action.

benefit—which he selected in his 1991 application and which he understood would terminate in 2001—and potential "additional benefits accruing after payment of the Actuarial Equivalent," (Pl.'s Opp'n 20), the Plan repeatedly and unequivocally informed Plaintiff that all benefits (including those benefits awarded in the form of cost-of-living adjustments) to which he was entitled under the Plan would terminate as of July 31, 2001. Any argument that these communications left open the possibility that Plaintiff might accrue "future substantive rights" to additional benefits, (*see* Pl.'s Opp'n 24), after the full payment of his 10 Year Certain Only benefit is not plausible and strains credulity.

Furthermore, all benefit payments—including the COLAs that Plaintiff received from 1996 to 2001—did in fact cease as of July 31, 2001. If Plaintiff believed he was entitled to additional monies from the Plan, the complete termination of his benefits on July 31, 2001 was undoubtedly sufficient to put him on notice of Defendant's alleged error. Accordingly, I find that the Plan's repeated written warnings throughout the 1990s, followed by the actual cessation of any and all benefit payments on July 31, 2001, served as a clear repudiation by the Plan of any claim by Plaintiff to future benefits. By July 2001, there was more than "enough information available" to Plaintiff such that he "reasonably should [have] know[n]" of the alleged miscalculation of his benefits. *Novella*, 661 F.3d at 147; *see also Moses v. Revlon Inc.*, No. 15-cv-4144 (RJS), 2016 WL 4371744, at *5 (S.D.N.Y. Aug. 11, 2016) (finding that significant discrepancy between benefit actually received by Plaintiff and greater amount Plaintiff believed was owed "rendered the supposed miscalculation obvious and constitute[d] a clear repudiation of Plaintiff's claim"), *aff'd*, 691 F. App'x 16 (2d Cir. 2017); *Hirt*, 285 F. App'x at 804 (finding that ERISA claim accrued when Plaintiff received summary plan description ("SPD") because to the extent Plaintiff "considered himself entitled to benefits other than those disclosed in the SPD, the

SPD unequivocally repudiated that understanding" (internal quotation marks omitted)).

The fact that the Plan did not formally deny Plaintiff's subsequent request for additional benefits until June 2015—nearly fourteen years after Plaintiff received his final benefit payment—cannot and does not render Plaintiff's claims timely. To hold that the limitations period did not begin to run until Plaintiff finally inquired into the calculation of his benefits and the Plan rejected his claim would reward Plaintiff's lack of diligence and permit other potential ERISA claimants to effectively extend the limitations period indefinitely. *See Holland v. Becker*, No. 08-CV-6171L, 2013 WL 5786590, at *4 (W.D.N.Y. Oct. 28, 2013) ("[P]laintiffs [could not] unilaterally extend their limitations period by filing administrative claims years after they were put on notice" of how their benefits were calculated); *see also Novella*, 661 F.3d at 146–47 (rejecting a standard that would permit a beneficiary to "collect benefit checks for twenty or thirty years without any obligation to inquire as to the correctness of the calculations underlying the benefit payments"). Such an approach would wholly undermine the very purpose of a statute of limitations. *See Order of R.R. Telegraphers v. Ry. Express Agency, Inc.*, 321 U.S. 342, 348–49 (1944) ("Statutes of limitation . . . are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared.").

Accordingly, I find that the applicable six-year statute of limitations began to run no later than July 31, 2001, and expired six years later, on July 31, 2007—more than ten years before Plaintiff initiated this suit. Because I have determined that Plaintiff's claims are time-barred and must therefore be dismissed, I do not reach Defendant's challenge to the merits of Plaintiff's claims.

## V.     Conclusion

For the foregoing reasons, Defendant's motion to dismiss, (Doc. 21), is GRANTED.

The Clerk of Court is respectfully directed to enter judgment for Defendant and close the case.

SO ORDERED.

Dated: March 20, 2019
      New York, New York

Vernon S. Broderick
United States District Judge